M. KATZ v. THE STATE.

No. 6706.    Decided November 22, 1922.

1.—Embezzlement—Bailee—Owner—Insufficiency of the Evidence.

Where, upon trial of misdemeanor embezzlement as bailee of a certain bank check, the evidence disclosed that the alleged principal had no such general authority to draw checks against the funds in the alleged

bank as would support the allegation that he was the owner thereof, the conviction could not be sustained.

### 2.—Same—Requested Charges—Control and Management.

Where, upon trial of embezzlement, the court refused several requested charges relative to the issue as to whether the principal of the defendant had such management and control over the funds in the alleged bank as would support the allegation of ownership in him, the same was reversible error.

### 3.—Same—Evidence—Contradicting Own Witness.

Where the alleged principal of the check had failed to testify to some facts upon the instant trial beneficial to the State to which he had testified on a former trial, and such testimony was introduced in the instant trial over the objection of the defendant the same ¬as reversible error.

### 4.—Same—Impeaching Own Witness—Rule Stated.

That a party may impeach his own witness where he states an affirmative, injurious fact which comes in the nature of a surprise is well settled, but where a witness merely fails to testify to facts expected to be elicited, the party offering him cannot under the guise of impeachment supply the evidence from another source. Following Bryan v. State, 234 S. W. Rep., 83.

Appeal from the County Court of Smith.   Tried below before the Hon. D. R. Penington.

Appeal from a misdemeanor embezzlement; penalty, a fine of $500 and one year confinement in the county jail.

The opinion states the case.

*Bulloch & Ramey,* and *Simpson, Lasseter & Simpson,* for appellant. —On question of impeaching own witness: Largin v. State, 37 Texas Crim. Rep., 574; Bailey v. State, 37 id., 579; Cannon v. State, 202 S. W. Rep., 83.

On question of proving alleged owner: Kraft v. State, 217 S. W. Rep., 1038; Whitaker v. State, 211 id., 788.

*R. G. Storey* Assistant Attorney General, for the State.

HAWKINS, Judge.—Conviction is for misdemeanor embezzlement, punishment assessed at a fine of five hundred dollars and one year imprisonment in the county jail.

The specific charge against appellant is that he was the bailee of a certain check bailed to him by I. Levine.   The check was drawn against the Peoples Guaranty State Bank of Tyler, Texas, payable to the order of I. Grossberg for $55, signed by F. Levine.   It is alleged that the check was written by I. Levine, and that the money, although in the bank in the name of F. Levine, was owned by I. Levine; that appellant converted the check into $55 in money, and that as the

agent of I. Levine was, the bailee of the check and was in possession of the proceeds by virtue of such agency; that said money was owned by I. Levine and that appellant fraudulently and without the consent of I. Levine embezzled $10 thereof.

It is urged that the evidence does not support the allegations of the information and therefore the judgment should not be permitted to stand. It appears from the statement of facts that F. Levine owned two stores in the city of Tyler, one a grocery store, which he looked after personally; the dry goods store was to a certain extent under the management of I. Levine, the son of F. Levine. We gather from the record that the grocery store account, as well as the personal account of F. Levine was kept at the Citizens National Bank; that the bank account for the dry goods store was kept at the Peoples Guaranty State Bank, but both accounts were in the name of F. Levine. I. Grossberg also was the owner of a dry goods store in the city of Tyler. Appellant, who is an uncle of I. Levine, had been negotiating with Grossberg for the purchase of some shoes. Grossberg and he had taken an invoice of the shoes which amounted to about $55. It appears from the record that appellant had reported to F. Levine that these shoes could be purchased and by the direction of F. Levine appellant went to I. Levine and informed him that his father had directed him to give appellant a check for the $55 with which to purchase the shoes. Under this information I. Levine wrote the check in question but directed appellant at the time to buy the shoes as cheaply as possible. Upon returning to Grossberg appellant informed him that I. Levine would not agree to give more than $45 for the shoes and after some remonstrance Grossberg agreed to accept this amount. He knew appellant had a check payable to him (Grossberg) but did not know for what amount the check had been drawn, and having recently been involved in bankruptcy proceedings did not himself wish to go to the Peoples Guaranty State Bank to cash the check for fear they would hold the money. He authorized appellant to cash the same for him, whereupon appellant had his son (Solomon Katz) to take the check in question to the Citizens National Bank and indorse Grossberg's name thereon and collect the money, which was given to appellant. He delivered to Grossberg $45 and retained $10. All parties, seemed to be pleased with the trade and the shoes appear to have been well worth the $55. I. Levine thought he had paid $55 for them and Grossberg did not know the check was for more than $45. A few days after the transaction in a conversation between I. Levine and Grossberg it was discovered that appellant had kept $10 of the money, which was promptly claimed by both of them, and both made demands of Katz for the $10 he had retained. The legal question revolves around the pivotal issue as to whether the money in the Peoples Guaranty State Bank belonged to I. Levine in the sense that it would support the allegations to that effect in the

information. Upon this point the testimony of I. Levine is substantially as follows: He denied that he operated the dry goods store in question but averred that it was owned and operated by his father; that he (I. Levine) worked there and helped his father out; that his father worked in the grocery store but also came around to the dry goods store; that he gave the $55 check to appellant because his father had directed him to do so. In answer to the direct question as to whether he (I. Levine) was manager of the store he replied:

"Well, I am not by its manager, I am just helping out mein fadder. Yes, I am the manager of that store when mein fadder is away. I am staying there."

In reply to the question:

"Have you got authority to write any checks on the bank?" he answered:

"No, I have to ask him, he tell me."

The check book on the Peoples Guaranty State Bank being submitted to the witness he admitted that he had written all of the checks but claimed that before he wrote them it was necessary for him to explain them in his language to his father with reference to the purchase of goods and that he could not write a check unless he told his father; that when a bill came to the store for anything it was necessary for him to explain to his father everything about it and then his father would authorize him to draw the check. The witness further stated that his father did not read very well and sometimes would give a personal check and get the banks confused and that "they charge it in this account." We are not able to determine just what witness meant by the last expression quoted. Being questioned further with reference to the management of the store this witness answered:

"Well, I have got a manager of it. I work for mein fadder and under his supervision. Yes, I am just an employee or just work there in the store. In buying goods and paying for them it is mein fadder's money that I use."

With reference to the payment for goods, he stated that he usually consulted his father before issuing the check, and that his father had to give him authority to issue them.

We think the foregoing statement of the evidence relative to the point at issue fairly reflects the record. There is no question but that the money in both the banks belonged to F. Levine. We think it is made fairly clear by the evidence that I. Levine had no such general authority to draw checks against the funds in the Peoples Guaranty State Bank as would support the allegation that he was the owner thereof. In a sense he was the manager of the dry goods store, and we may assume from the record that he deposited the proceeds from the sale of goods in the Peoples Guaranty State Bank, but

here his direction and supervision over the funds seems to have ceased. It was only by the direction of his father (F. Levine) that he drew checks affecting the funds in that bank. We do not believe the evidence supports the allegation in the information that I. Levine was the owner of such funds. He had no such management and control thereof as would bring him within the definition of a special owner under the law. Furthermore, there is nothing in the record which shows that the $55 check in question was ever charged to the account of F. Levine at the Peoples Guaranty State Bank. The evidence does show that appellant's son cashed the check at the Citizens National Bank. As we understand the evidence, F. Levine sometimes made mistakes in drawing checks, confusing the banks upon which he intended to draw them. It is not made plain from the record whether these checks were charged to his account at the bank at which presented or were held for collection against the other bank. We do not know from the record in this case whether, even conceding a partial control to I. Levine of the funds in the Peoples Guaranty State Bank, that this check was ever charged to that account, but may have been charged to the account of F. Levine at the Citizens National Bank of which funds there is not even a contention that I. Levine had any supervision whatever.

Several special charges were requested relative to the issue just discussed calling for the jury to determine from the evidence whether I. Levine had such management and control over the funds in the Peoples Guaranty State Bank as would support the allegation of ownership in him. All were refused. In this the trial judge was in error. The issue was fairly made by the evidence and ought to have been submitted to the jury for their determination.

It appears by one bill of exception that I. Levine had failed to testify to some facts upon this trial beneficial to the State, to which he had testified on a former trial. The court's qualification to the bill would lead us to believe that the trial judge thought the witness had undergone a "change of heart" with reference to the transaction, and the qualification, instead of aiding the State rather intensified the error. A portion of the testimony of I. Levine at a former time was introduced in the instant trial over objections urged; first, that no predicate had been laid therefor; and second, even if such had been done that the State had no right under the guise of impeachment to supply testimony which the witness had simply failed to give. In so far as the testimony on the former trial would supply any *hiatus* in the witness's testimony in the instant investigation the admission thereof was erroneous. That a party may impeach his own witness where he states an affirmative injurious fact which comes in the nature of a surprise is well settled. Rose v. State, 45 S. W. Rep., 808; Finley v. State, 47 S. W. Rep., 1015; but it is equally true that if the witness merely fails to testify to facts expected to be elicted

the party offering him cannot under the guise of impeachment supply the evidence from a third party, or get before the jury statements that are otherwise inadmissible. See Bryan v. State, 90 Texas Crim. Rep., 175, 234 S. W. Rep., 83, and many authorities cited therein.

For the reasons given it become the duty of this court to reverse the judgment and remand the case for a new trial.

*Reversed and remanded.*